**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

| | |
|---|---|
| TAQUERIA EL PRIMO LLC, VICTOR MANUEL DELGADO JIMENEZ, MITCHELLE CHAVEZ SOLIS, BENJAMIN TARNOWSKI, EL CHINELO PRODUCE, INC., and VIRGINIA SANCHEZ-GOMEZ, individually and on behalf of all others similarly situated, | Civil No. 19-3071 (JRT/ECW) |

Plaintiffs,

v.

ILLINOIS FARMERS INSURANCE COMPANY; FARMERS INSURANCE EXCHANGE; FARMERS GROUP, INC.; TRUCK INSURANCE EXCHANGE; FARMERS INSURANCE COMPANY, INC.; and MID-CENTURY INSURANCE COMPANY,

Defendants.

**MEMORANDUM OPINION AND ORDER ON CROSS MOTIONS FOR SUMMARY JUDGMENT AND MOTIONS TO EXCLUDE**

Anne T. Regan and Nathan D. Prosser, **HELLMUTH & JOHNSON PLLC**, 8050 West Seventy-Eighth Street, Edina, MN 55439; David W. Asp, Derek C. Waller, Jennifer Jacobs, Kristen G. Marttila, and Stephen Matthew Owen, **LOCKRIDGE GRINDAL NAUEN PLLP**, 100 Washington Avenue South, Suite 2200, Minneapolis, MN 55401; Paul J. Phelps, **SAWICKI & PHELPS**, 5758 Blackshire Path, Inver Grove Heights, MN 55076, for plaintiffs.

Emily C. Atmore, John Katuska, and Marc A. Al, **STOEL RIVES LLP**, 33 South Sixth Street, Suite 4200, Minneapolis, MN 55402; Timothy W. Snider, **STOEL RIVES LLP**, 760 Southwest Ninth Avenue, Suite 3000, Portland, OR 97205, for defendants.

Plaintiffs represent a Damages Class and an Injunctive Class who brought claims against Defendants Illinois Farmers Insurance ("Illinois Farmers"); Farmers Group, Inc. ("FGI"); Trucker Insurance Exchange ("TIE"); Farmers Insurance Company, Inc. ("FICI"); Farmers Insurance Exchange ("FIE"); and Mid-Century Insurance Company ("Mid-Century") (collectively "Farmers") under the Minnesota Consumer Fraud Act ("MCFA"), the Minnesota Uniform Deceptive Trade Practices Act ("MDTPA"), and for breach of contract.  Plaintiffs allege that Farmers entered into billing limitation agreements with healthcare providers that violate the Minnesota No-Fault Automobile Insurance Act (the "No-Fault Act" or "the Act").  At the conclusion of discovery, Defendants moved to exclude the expert testimony of Allan I. Schwartz, Dr. Akshay R. Rao, and Michael Rothman.  Plaintiffs moved to exclude the expert testimony of Bruce Strombom and of Nancy Watkins.  The parties also cross moved for summary judgment.

As for Defendants' motions to exclude, the Court will deny the motion to exclude Schwartz's testimony because it finds that Schwartz's methodology is reliable and helpful to the jury, but the jury must nevertheless consider and conclude whether there are any damages in this case.  The Court will deny the motion to exclude Dr. Rao because he properly relies on his expert qualifications and expertise and because mere challenges to his conclusions are not grounds for exclusion.  The Court will deny the motion to exclude Rothman's testimony because he properly relies on his own background and expertise.  As for Plaintiffs' motions to exclude, the Court will deny the motion to exclude Strombom

because it finds that he is the proper author of his report. The Court will also deny the motion to exclude Watkins because disagreements over the inputs used in an otherwise reliable model are not grounds for exclusion.

The Court concludes that the billing limitation agreements entered into by Farmers violate the No-Fault Act as prohibited preestablished limitations and because they have the effect of managed care, which is also prohibited by the No-Fault Act.

The Court also concludes that the Damages Class's MCFA claims are actionable because Farmers omitted a material fact and because the Court finds that the nature of the billing limitations and their confidentiality constitute special circumstances giving rise to a legal or equitable duty to disclose them under Minnesota law. However, the Court will deny partial summary judgment to Plaintiffs because issues of fact remain as to whether Plaintiffs can prove a causal nexus between any damages that may exist and the billing limitations.

Because the Court finds the billing limitations violate state law, the Court will grant summary judgment to the Injunctive Class and enjoin Farmers from entering or enforcing these and similar agreements with providers. However, the Court grants summary judgment to Farmers on the breach of contract claims because Plaintiffs failed to prove that explicit terms in their policies guaranteed them their choice of provider and because certifying compliance with state law does not incorporate all aspects of said statute into a contract.

Finally, the Court denies Farmers' request to dismiss all claims against FGI, because issues of fact remain as to their involvement in the policies challenged by Plaintiffs. However, the Court will dismiss all claims against FICI because Plaintiffs failed to produce any evidence that FICI issued any policies to Class Members or anyone in Minnesota.

## BACKGROUND

### I.   FACTUAL BACKGROUND

Defendants consist of many divisions of Farmers that are involved in the auto insurance business.  Defendants TIE, FIE, Illinois Farmers, and Mid-Century all underwrite personal and commercial automobile policies in Minnesota.  (*See* Decl. Margaret S. Giles ("Giles Decl.") ¶¶ 7–10, Feb. 11, 2022, Docket No. 371.)  FGI provides various common services to the other Defendants including legal and underwriting services, billing, advertising, drafting policy language and forms, internal investigations and discipline, and regulatory filings.  (1st Decl. of David W. Asp ("1st Asp Decl."), Ex. 2 at 64:17–69:7, Mar. 20, 2021, Docket No. 129-1.)  Collectively, Farmers has issued hundreds of thousands of policies worth more than $1 billion in total premiums paid over the relevant time period. (1st Asp Decl., Ex. 20, at 5, Mar. 30, 2021, Docket No. 129-18.)

Farmers sells insurance policies in Minnesota that purport to conform with the Minnesota No-Fault Automobile Insurance Act.  (*See e.g.,* 1st Decl. of Kristen G. Marttila ("1st Marttila Decl."), Ex. 23, at 19, Feb. 16, 2023, Docket No. 550-18.)  The No-Fault Act "is a comprehensive and highly-detailed statutory scheme that governs the compensation

of persons injured in automobile accidents." *Stout v. AMCO Ins. Co.*, 645 N.W.2d 108, 112

(Minn. 2002). The Act states that its purpose is in part:

> to relieve the severe economic distress of uncompensated victims of automobile accidents within this state by requiring automobile insurers to offer [insurance] . . . which will provide prompt payment of specified basic economic loss benefits to victims of automobile accidents without regard to whose fault caused the accident.

Minn. Stat. § 65B.42(1).

It is undisputed that beginning in 2012, Farmers entered into confidential

settlements with certain providers under which the providers agreed not to bill Farmers

for any treatment provided to someone insured by Farmers.[1]  (1st Marttila Decl., Ex. 22,

at 3–7, Feb. 16, 2023, Docket No. 551-15.)  Some of these agreements restricted billing

not only by named individuals and practices, but also by any individuals associated with

the named practices. (*See e.g.,* 1st Marttila Decl., Ex. 17, ¶ 3, at 4, Feb. 16, 2023, Docket

No. 550-14.)

It is also undisputed that Farmers did not disclose the agreements and their billing

limitations to consumers, the Minnesota Department of Commerce, or to its own

insurance agents. (1st Marttila Decl., Ex. 22, at 3–6, Feb. 16, 2023, Docket No. 551-15.)

---

[1] For consistency with prior opinions, the court refers to these agreements as "billing limitations."

Purchasers of insurance products from Farmers were thus unaware that certain providers were not permitted to bill Farmers if a policyholder sought care from the provider.

The number of providers subject to these agreements varied over time. For example, some of the providers' billing limitations ceased after a set amount of time. (Decl. John P. Darnell ("Darnell Decl.") ¶¶ 25–30, May 28, 2021, Docket No. 159.) Other billing limitations are perpetual and will never end absent an agreement between Farmers and the provider. (*See id.* ¶¶ 29–30.) Farmers claims that only two agreements currently remain in effect. (*Id.* ¶ 60; Defs.' Mem. Opp. Mot. Summ. J. at 21, Mar. 9, 2023, Docket No. 624.)

Named Plaintiffs Taqueria El Primo LLC, Victor Manuel Delgado Jimenez, Mitchelle Chavez Solis, El Chinelo Produce, Inc., Virginia Sanchez-Gomez, and Benjamin Tarnowski represent individuals and businesses that bought No-Fault insurance policies from Farmers on or after January 17, 2013. They each allege that they were unaware that Farmers entered into the agreements with providers to not bill Farmers and that the value of their policy was not what Farmers represented at the point of sale because the billing limitations agreements violate the No-Fault Act. (*See generally* Compl., Dec. 11, 2019, Docket No. 2-1.)

## II.   PROCEDURAL HISTORY

### A.  PAST MOTIONS

Plaintiffs initiated this action on behalf of themselves and all other similarly situated in 2019. (Notice of Removal, Dec. 11, 2019, Docket No. 2.) They bring claims

under the Minnesota Consumer Fraud Act ("MCFA"), the Minnesota Deceptive Trade Practices Act ("MDTPA"), and for breach of contract.  Plaintiffs moved for and the Court certified two classes: a Damages Class and an Injunctive Class.  The Damages Class is defined as:

> All persons or entities that purchased an insurance policy on or after January 17, 2013, within the State of Minnesota from any of the Defendant Insurers that provided for medical expense benefits under Minnesota's No Fault Act.

*See Taqueria El Primo LLC v. Illinois Farmers Ins. Co.*, 577 F. Supp. 3d 970, 1006 (D. Minn. 2021); *Taqueria El Primo LLC v. Illinois Farmers Ins. Co.*, No. 19-3071, 2023 WL 203933, at *2 (D. Minn. Jan. 17, 2023) (clarifying the class definitions).  The Damages Class was certified to proceed on the MCFA claim, but the Court denied certification of the Damages Class on the MDTPA and breach of contract claims.  *Taqueria El Primo LLC*, 577 F. Supp. 3d at 1005.

The Court also certified an Injunctive Class defined as:

> All persons or entities that purchased an insurance policy on or after January 17, 2013, within the State of Minnesota from any of the Defendant Insurers that provided for medical expense benefits under Minnesota's No Fault Act, and who maintain that policy.

*Taqueria El Primo LLC*, 2023 WL 203933, at *2.  The Injunctive class was certified to proceed on the MDTPA and breach of contract claims.  *Taqueria El Primo* LLC, 577 F. Supp. 3d at 1005.

**B.      Motions to Exclude**

On February 16, 2023, Defendants moved to exclude Plaintiffs' expert witnesses Akshay R. Rao, Michael J. Rothman, and Allan I. Schwartz. (*See* Defs.' Mot. Exclude Rao, Docket No. 552; Defs.' Mot. Exclude Rothman, Docket No. 554; Defs.' Mot. Exclude Schwartz, Docket No. 555.)  Plaintiffs moved to exclude two of the Defendants' rebuttal expert witnesses: Nancy Watkins and Bruce Strombom.  (*See* Pls.' Mot. Exclude Watkins, Feb. 16, 2023, Docket No. 558*;* Pls.' Mot. Exclude Strombom, Feb. 16, 2023, Docket No. 573.)

**C.      Motions for Summary Judgment**

The parties cross-moved for summary judgment.  Plaintiffs moved for partial summary judgment for the Damages Class—seeking to leave just the issue of damages under the MCFA to the jury—but moved for summary judgment on all claims with respect to the Injunctive Class.  (*See generally* Damages Class Mot. Partial Summ. J. and Injunctive Class Mot. Summ. J., Feb. 16, 2023, Docket No. 546.)  Defendants seek summary judgment on all claims.  (*See* Defs.' Mot. Summ. J., Feb. 16, 2023, Docket No. 557.)

**MOTIONS TO EXCLUDE**

The Court will first consider the motions to exclude before turning to the parties' summary judgment motions.  Federal Rule of Evidence 702 governs the admissibility of expert testimony and provides the following:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.

The district court has a gate-keeping obligation to make certain that all testimony admitted under Rule 702 satisfies these prerequisites and that "any and all scientific testimony or evidence admitted is not only relevant, but reliable." *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589 (1993). The proponent of the expert testimony has the burden of establishing by a preponderance of the evidence that the expert is qualified, that his or her methodology is scientifically valid, and that "the reasoning or methodology in question is applied properly to the facts in issue." *Marmo v. Tyson Fresh Meats, Inc.*, 457 F.3d 748, 757–58 (8th Cir. 2006). Expert testimony is inadmissible if it is "speculative, unsupported by sufficient facts, or contrary to the facts of the case." *Id.* at 757.

"[T]he trial judge must have considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable." *Kumho Tire v. Carmichael*, 526 U.S. 137, 152 (1999). However, the Eighth Circuit has held that "[c]ourts should resolve doubts regarding the usefulness of an expert's testimony in favor

of admissibility." *Marmo*, 457 F.3d at 758. "As a general rule, the factual basis of an expert opinion goes to the credibility of the testimony, not the admissibility, and it is up to the opposing party to examine the factual basis for the opinion in cross-examination." *Loudermill v. Dow Chem. Co.*, 863 F.2d 566, 570 (8th Cir. 1988). "Only if [an] expert's opinion is so fundamentally unsupported that it can offer no assistance to the jury must such testimony be excluded." *Bonner v. ISP Techs., Inc.*, 259 F.3d 924, 929–30 (8th Cir. 2001) (quoting *Hose v. Chi. Nw. Transp. Co.*, 70 F.3d 968, 974 (8th Cir. 1995)).

## I.    ALLAN SCHWARTZ

Allan I. Schwartz is the President of AIS Risk Consultants, an actuarial consulting firm he founded in 1984. (Decl. Margaret E. Dalton ("Dalton Decl."), Ex. 6 ("Schwartz Report"), ¶ 1, Feb. 11, 2023, Docket No. 358.) Schwartz has more than 40 years of experience as an actuary, and he performs coverage analysis for both property and casualty insurance companies. (*Id.* ¶¶ 2–8.) Plaintiffs offer Schwartz's testimony primarily to support their damages theory under the MCFA. (*Id.* ¶ 12.)

Schwartz attempts to measure the damages to the Classes by estimating the decrease in value of the insurance coverage attributable to the billing limitations. (*Id.* ¶¶ 11–13.) Schwartz proposes that the value of an insurance policy to the policyholder is the expected benefit to be received by the policyholder, and that the expected benefit is equal to the expected losses for the insurance company. (*Id.* ¶ 24.) Central to his analysis is the idea that if the actual benefits paid out are improperly restricted, then the value of the policy decreases as well. (*Id.* ¶ 35.) Schwartz arrives at the estimated decrease in

-10-

value by calculating a "Factor" that attempts to isolate the impact of the billing limitations on benefits paid.  (*Id.* ¶ 16.)  In other words, Schwartz estimates what percent of the decrease in losses by Farmers in the relevant time period can be attributed to the billing limitations.  Schwartz then multiplies that Factor by the premiums the Plaintiffs paid during the relevant period to arrive at total damages.  (*Id.* ¶ 13.)  Schwartz's Factor is comprised of two parts: (1) a comparison of loss ratios and loss costs at Farmers versus the insurance industry averages in Minnesota, and (2) an estimate of the impact the billing limitation had on providers subject to them.  (*Id.*  ¶¶ 39–57; 58–62.)

*Industry Analysis*

A decrease in loss ratio[2] means that the insurance company pays out less in benefits than it collects in premiums over time.  Schwartz reports that Farmers experienced a "dramatic drop" in loss ratios after 2012, which corresponds with when Farmers implemented the billing limitation agreements.  (*Id.*  ¶¶ 41, 52.)  Although loss ratios across the industry similarly decreased during this time, Schwartz explains that such decrease was on average "much less than that for Farmers," suggesting something unique was happening at Farmers.  (*Id.* ¶ 45.)  Schwartz attempts to quantify the Farmers-specific Factor by subtracting the loss ratio experienced by the industry from the loss ratio

---

[2] The loss ratio represents what percentage of premiums are eventually paid out to insureds and is calculated as losses divided by premiums.  (Schwartz Report ¶ 40, n.19.)

experienced by Farmers, therefore "eliminating the items that influenced the insurance industry as a whole." (*Id.* ¶¶ 45–46.)

Schwartz conducted a similar analysis on the loss costs, which is the ratio of losses to exposures, and reached the same conclusion: that Farmers' ratio dropped more than rest of the insurance industry. (*Id.* ¶¶ 47–50.) Thus, Schwartz suggests that something unique was happening at Farmers and the main cause is likely the billing limitations. (*Id.* ¶ 52.) Schwartz also lowered the estimated impact of the billing limitation because the drop could be partially attributable to a reduction in fraudulent insurance payments. (*Id.* ¶¶ 55–56.) Thus, Schwartz concludes that the billing limitations likely accounted for a drop in benefits paid out by Farmers by approximately 15.6%–21.3%. (*Id.* ¶ 57.)

*Provider Analysis*

The second component of Schwartz's Factor is the total reduction in payments to providers attributable to the billing limitations. Schwartz estimated, based on historical payments, that the reduction due to billing limitations to providers was between $6.84 million and $8.19 million over the class period. (*Id.* ¶¶ 58–62.) Comparing these with Farmers' total incurred loss during the relevant period, Schwartz estimates that the reduction in payments to these providers accounted for 5.5% to 6.1% of Farmers' incurred losses. (*Id.*)

*Final Factor Estimate*

-12-

Schwartz weighed the industry-wide and the provider-specific analyses and estimates that the billing limitations impacted 10.4% to 13.7% of losses. (*Id.* ¶ 63.) Schwartz indicates that this estimate would correspond to an impact of between 4.45% to 5.86% of premiums paid. (*Id.* ¶¶ 64–65.) Multiplying the Factor against Farmers' total earned premium results in damages between $14 million and $18.5 million. (*Id.* ¶ 66.)

Finally, Schwartz estimates that for every $1.00 of benefit Farmers pays out, they receive $1.50 of premium revenue. (*Id.* ¶ 18.) Therefore, assuming the total damages estimate of $14 million to $18.5 million, Farmers benefited from an additional $21 to $27.8 million in revenue. (*Id.* ¶ 67.)

### A. Grounds for Exclusion

First, Farmers moves to exclude Schwartz's testimony arguing its fundamental assumptions are unsupported by the record and that there is too great of an analytical leap between the facts and the opinion offered. Specifically, Farmers argues that Schwartz makes the fatal assumption that "no insureds who may have been 'turned away' . . . obtained care from another [covered] provider, and that Farmers never paid any no-fault medical-expense benefits for these individuals." (Mem. Supp. Mot. Exclude Schwartz at 13, Feb. 16, 2023, Docket No. 586.) In other words, if everyone who was turned away by a provider due to the billing limitation nonetheless received care from another qualified medical provider, then there could be no reduction in benefits to the insureds due to the billing limitations, and any decrease in the loss ratio or loss cost must be for some other reason. Schwartz admits that his analysis does not account for this

kind of replacement treatment.  (Dalton Decl., Ex. 7 ("Schwartz Dep."), at 256:7–17, Feb. 10, 2022, Docket No. 352-7.)

An expert's testimony "is inadmissible if it is speculative, unsupported by sufficient facts, or contrary to the facts of the case."  *In re Wholesale Grocery Prods. Antitrust Litig.* ("*SuperValu*"), 946 F.3d 995, 1001 (8th Cir. 2019).  However, disagreement with the expert's conclusions alone is not proper grounds for exclusion.  *See Edina Realty, Inc. v. TheMLSonline.com*, No. 04-4371, 2006 WL 737064, at *3 (D. Minn. Mar. 20, 2006) (citing *Daubert*, 509 U.S. at 596) (noting that the Court must focus on principles and methodology, and not on the conclusions generated, which are better suited for cross-examination).

Although Farmers focuses on whether anyone was **actually** denied benefits, this case is about consumer fraud—not denial of benefits per se.  Under Plaintiffs' theory, the fundamental issue is whether the value of the insurance policies was lower than what Plaintiffs paid for.  That is precisely what Schwartz attempts to measure by estimating the difference between what was actually paid out versus what would have been expected to be paid out.

Ultimately, the Court concludes that Farmers highlights valid and persuasive criticisms of Schwartz's model and estimates, but that these do not constitute grounds for exclusion because they challenge Schwartz's conclusions, not his methodology. Defendants point to *SuperValu*, in which the Eighth Circuit excluded an expert because of

a faulty assumption.  *SuperValu*, 946 F.3d at 1001 (excluding an expert because there was no support for the baseline competitor used to determine what prices would have been absent a conspiracy).  But *SuperValu* is distinguishable because Schwartz did not simply select another insurer to compare as the baseline for Farmers' loss ratios.  Instead, he compares Farmers to the entire Minnesota auto insurance industry.  Therefore, there is less concern that he utilized an improper baseline.  Of course, whether Schwartz's conclusions are consistent with the evidence in this case is an open question best left for cross-examination and the jury.

Second, Farmers moves to exclude Schwartz's analysis because it does not match Plaintiffs' theory of liability in violation of *Comcast Corp. v. Behrend*, 569 U.S. 27 (2013).  Farmers argues that Schwartz's methodology does not measure damages resulting from any **individual's** decision to purchase Farmers auto insurance without knowledge of the billing limitations.

The Supreme Court has held that plaintiffs may only recover damage resulting from their theory of liability.  *Id.* at 35.  But Schwartz's analysis comports with Plaintiffs' theory: that class members were injured when they purchased policies that did not provide the expected benefits.  Under the theory that insurance policies have value irrespective of whether someone ever files a claim, Schwartz's methodology properly attempts to measure the decrease in value, if any, attributable to billing limitations.

It can be safely assumed that the value of an insurance policy is at least partly determined by the services and providers that the insured will have access to. Thus, someone might be willing to pay more for a policy that provides greater coverage and access to more providers. Had Farmers disclosed that certain providers were not eligible, perhaps consumers would have gone somewhere else or been less willing to pay the premium demanded, which in turn could have spurred Farmers to lower its premium rates. Schwartz's analysis is an attempt to estimate what that difference in premiums would have been.

The Court will therefore deny the Motion to Exclude Schwartz's expert testimony and will not impose any limitations. Although the Court finds Schwartz's framework analytically sound, the jury need not presume that plaintiffs were injured. For example, Farmers argues that Schwartz failed to consider a number of relevant factors in his analysis such as the reduction in fraudulent payments, and alternative reasons for the decline in no-fault payments. Though not grounds for exclusion, the jury may evaluate critiques of Schwartz's model and decide whether damages were actually incurred.

## II.   DR. AKSHAY R. RAO

Dr. Akshay Rao is a tenured professor of Marketing at the University of Minnesota's Carlson School of Management. (Dalton Decl., Ex. 1 ("Rao Report") ¶ 2, Feb. 10, 2022, Docket No. 352-1.) Dr. Rao has served as Chair of the Department of Marketing and Logistics Management and is the founding Director of the Institute for Research in Marketing. (*Id.*) Dr. Rao is well published in research concerning marketing topics. (*Id.* ¶

3.)  He has consulted with numerous organizations on matters pertaining to consumer behavior, pricing, branding, and sales management.  (*Id.* ¶ 6.)  Plaintiffs offer Dr. Rao's opinions on whether consumers would have considered the billing limitations to be material to their decision to purchase Farmers' policies.  (*Id.* ¶ 10.)

Dr. Rao concludes that Defendants concealed material information when they did not disclose the billing limitations to consumers.  (*Id.*)  Dr. Rao relies on "consumer behavior principles" to conclude that consumers would have attached "negative weight" to information regarding the exclusion of certain medical providers, and that such negative information would have received more weight than positive information because of the principle of "loss aversion."[3]  (*Id.* ¶ 11.)  Dr. Rao goes concludes that Class Members would not have purchased auto insurance from Farmers.  (*Id.* ¶ 32.)

A central assumption of Dr. Rao's conclusions is that consumers expect all firms will meet a minimum quality level in regulated markets for services.  (*Id.* ¶¶ 16–17.)  Dr. Rao claims that Farmers' own research shows that policy coverage is important to consumers.  (*Id.* ¶ 18.)  He opines that certain aspects of a service can be a "dissatisfier" when omitted—without necessarily being a "satisfier" if included.  This means that offering the service does not make people more likely to choose a firm, but not offering it is of great import.  (*Id.* ¶ 19.)

---

[3] Loss aversion means that consumers weigh the absence of a feature, the reduction of a gain, or an outright loss much more than positive information.  (*Id.* ¶ 28.)

Although Dr. Rao does not conduct his own research or surveys on the topic, he concludes that the unavailability of a set of medical providers "would be germane to the decision-making process" of consumers.  (*Id.* ¶ 28.)  His relies upon the well-established and known role of "negativity salience and loss aversion."  (*Id.*)  In this case, the theory is that advertising coverage of all providers may not influence consumers—but admitting that some providers are excluded would be a red flag for consumers.  Finally, Dr. Rao reports that a customer staying with an insurance company upon learning of negative aspects is not necessarily a sign of satisfaction because dissatisfied consumers might simply stick with the insurance company due to "inertia, switching costs, and low information."  (*Id.* ¶ 29.)

### A.  Grounds for Exclusion

First, Farmers challenges Dr. Rao's testimony because it is based on generalized consumer behavior academic literature that is not specific to auto-insurance purchasing. Farmers argues that "no studies or academic literature support Rao's conclusion that all consumers have the same baseline expectation regarding 'regulated markets' like insurance."  (Mem. Supp. Mot. Exclude Rao at 14, Mar. 7, 2023, Docket No. 607.)  But the Court finds that Dr. Rao's opinion is properly supported by his expertise because he explains an underlying assumption in the field of marketing.  *See Kumho Tire Co.*, 526 U.S. at 148 ("Experts of all kinds tie observations to conclusions through the use of what Judge Learned Hand called 'general truths derived from . . . specialized experience.'").

Second, Farmers faults Dr. Rao for not conducting his own empirical research or studies.  However, there is no requirement to conduct surveys in these situations.[4]

Finally, Farmers argues that Dr. Rao's opinions are contradicted by the alleged actions of named Plaintiffs after they learned of the billing limitations.  However, Dr. Rao does not rely on these for his testimony.  Rather, he opines on the **likely** behavior of consumers.  For these reasons, the Court will deny the Motion to Exclude Dr. Rao's expert testimony.[5]

## III.  MICHAEL ROTHMAN

Michael Rothman is an attorney with over 33 years of experience in the areas of insurance regulation and industry practice.  (1st Marttila Decl., Ex. 16 ("Rothman Report")

---

[4] Farmers relies on *Honeywell International, Inc. v. ICM Controls Corp.* for this presumption, in which the court practically excluded Dr. Rao's testimony after observing that he had not conducted any research or studies of his own and concluding that his testimony did not amount to "reliable consumer or market research."  45 F. Supp. 3d 969, 989–90 (D. Minn. 2014).  However, this case is different from *Honeywell* and Dr. Rao's testimony was not actually excluded.  *Honeywell* was about false advertisement, and the primary factual dispute was what the phrase "Made in the USA" meant.  *Id.* at 985.  The district court concluded that the plaintiffs needed "reliable consumer or market research" to prove their false advertisement claim and establish the element of deception as instructed by the Eighth Circuit.  *Id.* at 989 (citation omitted).  The plaintiffs in *Honeywell* relied primarily on Dr. Rao's testimony to prove this element, but because Dr. Rao provided no research and because he lacked experience with the relevant population, the district court concluded that the plaintiffs could not establish the requisite element.  *Id.* at 989–990.  In contrast, here Dr. Rao is not testifying about a distinct set of people, but instead about general marketing principles related to how consumers interpret negative information.  This is squarely within his purview as an expert in marketing, and Farmers does not challenge his qualifications or credentials in that field.

[5] Farmers takes issue with Dr. Rao's assertion that **all** Farmers insureds would have refused to purchase Farmers insurance had they known of the billing limitations.  Though the Court does not exclude his testimony, this statement may be more properly suited for a motion in limine.

¶¶ 1–2, Feb. 16, 2023, Docket No. 550-13.)  He was the Commissioner of the Minnesota Department of Commerce ("DOC") from January 2011 to November 2017.  (*Id.* ¶ 3.)  The DOC regulates automobile insurance, including implementation of the No-Fault Act. (*Id.* ¶ 6.)  The 2015 Minnesota Legislature established a task force while he was Commissioner that the DOC led to review issues related to No-Fault automobile insurance reform.  (*Id.* ¶ 10.)  He has practiced law in Minnesota and California for 18 years and has extensive experience in insurance regulation.  (*Id.* ¶¶ 16–20.)

Plaintiffs asked Rothman to opine on (1) whether Farmers' actions were consistent with standards and practices in the automobile insurance industry in Minnesota; (2) whether the billing limitations were consistent with the DOC's regulatory compliance and reporting requirements; (3) whether the billing limitations limited the ability of insureds to receive treatment from their provider of choice; and (4) whether Farmers' compliance and training practices were consistent with industry standards.  Rothman also provides some context on the legislative history of the No-Fault Act.  (*Id.* ¶ 32.)

## A.  Grounds for Exclusion

Farmers moves to exclude portions of Rothman's testimony as inadmissible legal opinions.  Farmers argues that Rothman repeatedly makes statements of what the law is and that billing limitations violate the No-Fault Act.  Plaintiffs respond that Rothman is not providing impermissible legal opinions but rather opining about industry and regulatory practices.

Expert testimony that reflects on legal issues faces extra hurdles. At trial, "expert testimony on legal matters is not admissible" because "[m]atters of law are for the trial judge." *S. Pine Helicopters, Inc. v. Phoenix Aviation Managers, Inc.*, 320 F.3d 838, 841 (8th Cir. 2003). Expert testimony could give jurors the appearance that the Court is shifting to the expert the power to decide the case. *See Farmland Indus. v. Frazier-Parrott Commodities, Inc.*, 871 F.2d 1402, 1409 (8th Cir. 1989); *see also Portz v. St. Cloud State Univ.*, 297 F. Supp. 3d 929, 952 (D. Minn. 2018) (quoting *Farmland Indus.*, 871 F.2d at 1409).

The Court has determined on its own that the billing limitations are prohibited by the No-Fault Act—without consideration of Rothman's testimony—so any supposed legal conclusion does not constitute grounds for exclusion. However, because the Court has arrived at this conclusion already, any testimony on this legal question is likely irrelevant and may be the proper subject of a future motion in limine.

Farmers argues that all of Rothman's opinions are without support because they are based entirely on his experience as the DOC Commissioner from 2011 to 2017. However, the Court finds that Rothman's experience and background lends support to his opinions. Farmers also argues that Rothman's opinion regarding what the DOC would do is contradicted by the fact that the DOC opened an investigation into Farmers' billing limitations but closed it without further action. But that the DOC did not declare Farmers' billing limitations to be contrary to law or regulations does not contradict Rothman's

testimony because there are a number of reasons why the investigation could have been closed without action.

Finally, to the extent Rothman intends to testify regarding what the DOC would or would not have done had it known of the billing limitations, Farmers may address such testimony through motions in limine as potentially speculative testimony. Therefore, the Court will deny the Motion to Exclude Rothman's testimony.

## IV.   DR. BRUCE STROMBOM

Dr. Strombom is a Ph.D. economist and managing principal at Analysis Group, Inc., with more than 35 years of experience in corporate finance and financial and economic analysis. (*See* 2nd Decl. David W. Asp ("2nd Asp Decl."), Ex. 1 ("Strombom Report") ¶¶ 1–2, Feb. 16, 2023, Docket No. 577.) Strombom has experience in the healthcare and insurance field and has published papers on the topic of health insurance and consumer choice. (*Id.* ¶ 3.) He has consulted and testified as an expert in numerous healthcare-related disputes and has provided testimony in insurance rate proceedings before various state insurance regulatory agencies and the National Association of Insurance Commissioners. (*Id.*)

Defendants set forth Strombom's expert opinion as a critique of Schwartz's analysis. He questions Schwartz's methodology and argues that it does not measure the damages to individual class members because it does not capture the "range of different ways in which insureds may, or may not, have been affected" by the billing limitations. (*Id.* ¶ 9.) In particular, Strombom faults Schwartz for not considering geography in his

model because many class members were far away from providers subject to billing limitations. (*Id.*) Strombom also opines that Schwartz failed to isolate the potential benefit of the billing limitations to class members or to show whether they would not have bought Farmers insurance had they known of the limitations. (*Id.*)

### A. Grounds for Exclusion

Rather than focus on his methodology, Plaintiffs accuse Strombom of not writing his own report and of violating Rule 26 of the Federal Rules of Civil Procedure, which requires an expert witness to prepare their own report. Fed. R. Civ. P. 26(2)(B). Based on Strombom's deposition, Plaintiffs argue that the report was actually written by Strombom's assistants and that they are the real experts and authors. Although it is evident that Strombom was heavily supported by his assistants, the Court does not agree that Strombom admitted that he did not write his report or did not conduct any of the underlying research or analysis, as Plaintiffs suggest.

The Court finds that Strombom was adequately able to speak to the analysis and opinions contained in the report. (*See, e.g.,* 2nd Asp Decl., Ex. 2 ("Strombom Dep."), at 128:2–130:2; 131:5–132:15; 137:19–140:5, Feb. 16, 2023, Docket No. 577-1.) Critically, Plaintiffs do not claim that Strombom does not have the expertise to testify as to any of the analysis contained in the report. Instead, Plaintiffs rely extensively on one unpublished decision, *Weitz Co. LLC v. Lloyd's of London*, No. 4:04-90353, 2007 WL 7131908, at *4 (S.D. Iowa Sept. 28, 2007), to argue that an expert should be excluded when the expert's report is really drafted by someone else. However, this case is easily

distinguishable because the expert in *Weitz* was found to have done "nothing more than perus[e] the work product of [his assistant]" and sign his name on the report.  *Id.* at *3. Here, Strombom testified that he outlined the report and provided guidance throughout. (Strombom Dep. at 14:21–15:19, 55:12–24.)  If Strombom did not manage his assistants well, or cannot recall their exact contributions, those are appropriate subjects for cross-examination.

## V.    NANCY WATKINS

Nancy Watkins is a principal and consulting actuary employed by Milliman, Inc., an actuarial firm.  (Decl. Derek C. Waller, Ex. 7 ("Watkins Report") ¶¶ 1–2, Feb. 16, 2023, Docket No. 564-6.)  Watkins is a fellow of the Casualty Actuarial Society and a Member of the American Academy of Actuaries.  (*Id.* ¶ 1.)  Watkins has more than 30 years of experience as an actuary.  (*Id.* ¶ 3.)  She also has experience on ratemaking and financial reporting for a variety of organizations, including the National Association of Insurance Commissioners, the Internal Revenue Service, the Securities and Exchange Commission, and the Public Company Accounting Oversight Board.  (*Id.* ¶ 6.)  Watkins's testimony is offered by Farmers to rebut Schwartz's damages calculation.

Watkins opines that (1) Schwartz's estimates for damages are based on "unsound premises and unreasonable assumption"; (2) that Schwartz's analysis "grossly overestimated" what Farmers would have paid providers in the absence of billing limitations; (3) that Schwartz's analysis amounts to "retroactive ratemaking"; and (4) that

there is no basis for Schwartz to include "unjust enrichment or excess profits" in his calculations because that also amounts to retroactive ratemaking. (*Id.* ¶ 15.)

### A. Grounds for Exclusion

Plaintiffs challenge Watkins's report because she relied on Medicare data to estimate fraud rates in the auto insurance market in Minnesota to rebut Schwartz's estimated insurance fraud rates of 15% to 22%. (*Id.* ¶ 55.) These estimates are important because the higher the range of fraud, the lower the estimate of damages becomes under Schwartz's model. (*See* Schwartz Report ¶¶ 56–57.) However, this is not a proper ground for exclusion because it is not a challenge to methodology or principles. *See Edina Realty, Inc*, 2006 WL 737064, at *3. Each party may present to the jury why one input or another is more appropriate in estimating the fraud rates.

Plaintiffs also challenge two errata sheet submissions altering Watkins's deposition testimony. Federal Rule of Civil Procedure 30(e) permits deponents to review their transcript and make changes in form or substance provided they state the reasons for the changes. Fed. R. Civ. P. 30(e)(1)(B). The purpose of Rule 30(e) is not to change what was said under oath, but to correct mistakes from transcriptions. *See, e.g., Thorn v. Sundstrand Aerospace Corp.*, 207 F.3d 383, 389 (7th Cir. 2000) ("[A] change of substance which actually contradicts the transcript is impermissible unless it can plausibly be represented as the correction of an error in transcription, such as dropping a 'not.'").

Plaintiffs argue that Watkins made two inappropriate changes via errata.  (*See* Mem. Supp. Mot. Exclude Watkins at 18–19, Feb. 16, 2023, Docket No. 560 (comparing Watkins's deposition testimony and the errata); Watkins Errata Sheet, Feb. 16, 2023, Docket No. 564-11.)  In each instance, Watkins changed testimony that she could not remember the source for a statement in her report with a new answer that identifies the source.  These are not appropriate errata changes, and the Court will strike them from the record.  Of course, depositions are not memory tests and Watkins may update her testimony at trial and be cross-examined regarding the same.  Nevertheless, the Court finds that these are not grounds for exclusion because they do not concern her underlying methodology.  Therefore, the Court will deny the Motion to Exclude Watkins's expert testimony.

To summarize, the Court will deny each of the motions to exclude because it concludes that none of the challenged testimony is "so fundamentally unsupported that it can offer no assistance to the jury."  *Bonner*, 259 F.3d at 929–30.  This does not preclude the parties from moving to limit any of the experts' testimony under the Federal Rules of Evidence.  Finally, the Court will strike from the record the two errata sheet changes submitted by Watkins.

## CROSS MOTIONS FOR SUMMARY JUDGMENT

The Court will next consider the parties' cross motions for summary judgment. Summary judgment is appropriate when there are no genuine issues of material fact, and the moving party can demonstrate that it is entitled to judgment as a matter of law.  Fed.

R. Civ. P. 56(a).  A fact is material if it might affect the outcome of the suit, and a dispute is genuine if the evidence is such that it could lead a reasonable jury to return a verdict for the nonmoving party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A court considering a motion for summary judgment must view the facts in the light most favorable to the nonmoving party and give that party the benefit of all reasonable inferences to be drawn from those facts.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  The nonmoving party may not rest on mere allegations or denials but must show, through the presentation of admissible evidence, that specific facts exist creating a genuine issue for trial.  *Anderson*, 477 U.S. at 256 (discussing Fed. R. Civ. P. 56(e)).  "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff."  *Id.* at 252.

## I.    THE NO-FAULT AUTOMOBILE INSURANCE ACT

The Court must first determine whether the billing limitations violated the No-Fault Act as a matter of law.  The parties agree that this is a legal question for the Court to decide.  The parties also agree that this is an issue of first impression, so the Court must "attempt to predict how the Minnesota Supreme Court would decide" the issue.  *Godfrey v. State Farm Fire & Cas. Co.*, 11 F.4th 601, 602–03 (8th Cir. 2021) (citation omitted).

When reviewing a state statute, courts are bound by a state's rules of statutory interpretation.  *In re Dittmaier*, 806 F.3d 987, 989 (8th Cir. 2015).  Minnesota courts first

determine whether the statute's language is clear or ambiguous on its face—and a statute is only ambiguous when the language used is subject to more than one reasonable interpretation. *Depositors Ins. Co. v. Dollansky*, 919 N.W.2d 684, 687 (Minn. 2018) (citation omitted). Only if a statute is ambiguous may the Court look to extrinsic aids, such as the legislative record, to determine the legislative intent. *Reiter v. Kiffmeyer*, 721 N.W.2d 908, 911 (Minn. 2016).

The first question before the Court is whether the No-Fault Act's language unambiguously prohibits insurance companies from entering into agreements with providers prohibiting them from billing insurance companies. The parties each argue that the No-Fault Act is unambiguous but disagree as to the outcome. Plaintiffs propose that the Act prohibits the billing limitations via three possible provisions: (1) the requirement to reimburse "full medical expense benefits" as set forth in subdivision 2; (2) the prohibition on preestablished limitation; and (3) the prohibition on Managed Care Services. The Court will analyze each provision separately.

### 1. Medical Expense Benefits

The No-Fault Act states that "[b]asic economic loss benefits shall provide reimbursement for all loss suffered through injury arising out of the maintenance or use of a motor vehicle, subject to any applicable deductibles, exclusions, disqualifications, and other conditions . . . ." Minn. Stat. § 65B.44, subd. 1(a). The Act then mandates that:

> a person entitled to basic economic loss benefits under this
> chapter is entitled to the full medical expense benefits set forth

> in subdivision 2, and may not receive medical expense benefits
> that are in any way less than those provided for in subdivision 2,
> or that involve any preestablished limitations on the benefits.
> Medical expenses must be reasonable and must be for necessary
> medical care as provided in subdivision 2.

Minn. Stat. § 65B.44, subd. 1(b).  The Act begins by clarifying that those entitled to "**basic economic loss benefits**" (people who are covered by the Act), are entitled to the "**medical expense benefits**" in subdivision 2.  Subdivision 2 then provides that insurance companies "shall reimburse all reasonable expenses for necessary . . . medical, surgical, x-ray, optical, dental, chiropractic, and rehabilitative services, including prosthetic devices," among other medical services and treatment options.  Minn. Stat. § 65.44, subd. 2(a).

The parties' dispute centers on whether "may not receive medical expense benefits in any way less than those provided for in subdivision 2" refers to the insurance policy itself or the services guaranteed under subdivision 2.  The Court concludes that the statute is unambiguous.  When referencing the policies themselves, the Act uses "basic economic loss benefits."  Thus, it states that those entitled to "basic economic loss benefits" are entitled to the services listed in subdivision 2, which it refers to as "medical expense benefits."  Although subdivision 2 includes a somewhat confusing preface, it unambiguously provides a list of services and procedures that the insurance policy must cover.  Thus, the Court finds that the plain meaning of "may not receive medical expense benefits that are in any way less than those provided for in subdivision 2" is to prohibit policies that do not cover all of the services listed in subdivision 2**.**

Subdivision 2 does not reference who may or may not provide those services, so it is silent as to the present billing limitations issue.  Thus, the Court rejects Plaintiffs' argument that the billing limitations violate the statutory prohibition on providing "medical expense benefits that are in any way less than those provided for in subdivision 2" because the billing limitations did not limit the **kinds** of services that Plaintiffs could seek reimbursement for—just certain providers.

### 2. Preestablished Limitations

The No-Fault Act also prohibits any preestablished limitations on the benefits but does not define what "preestablished limitations" means.  To restate, the Act declares that "a person . . . may not receive medical expense benefits that are in any way less than those provided for in subdivision 2, or that involve **any** preestablished limitations on the benefits."  Minn. Stat. § 65B.44, subd. 1(b) (emphasis added).  But what are "preestablished limitations?"

Plaintiffs argue that the "benefits" mentioned at the end of the sentence here means "economic loss benefits" or the insurance policy itself, meaning that no limits may be placed on how the insurance can be used.  Thus, the Court must first consider the meaning of "benefits."  The Act does not define the terms "benefits" and it appears that the word has multiple meanings even within the same paragraph. The American Heritage Dictionary defines it as "[a] payment made by a government agency or insurance company to qualifying persons in time of need."  *Benefits,* The American Heritage Dictionary of the English Language (5th ed. 2022).  In contrast, Merriam-Webster

-30-

Dictionary defines "benefits" to mean "a service (such as health insurance) or right (as to take vacation time) provided by an employer in addition to wages or salary." *Benefits,* Webster's 3rd New Int'l Dictionary 2330 (11th ed. 2022). The Act utilizes "benefits" in each of the ways listed in Merriam-Webster; both as (1) the insurance policy, and (2) the services to reimbursed under subdivision 2.

However, context clearly supports that "benefits" here means "medical expense benefits." The use of "or" in the Act means that the medical expense benefits can neither be "less than those provided for in subdivision 2"—i.e., those kinds of services listed in subdivision 2—**nor** involve "any preestablished limitations." Once again, the Court must ask: what is a preestablished limitation?

Farmers attempts to define preestablished limitations by means of example. It asserts, for instance, that the Act would prohibit restricting how many x-rays a patient may receive. Plaintiffs contest that such reading conflicts with the intent of the legislature, which introduced the "preestablished limitations" language in 2002 specifically to forbid restrictions on **where** the benefits could be used. But the Court need not rely on legislative history to find that Farmers' reading is too limited. Because the use of the word "any" by the legislature supports a broad reading of the term "preestablished limitations," the most rational construction is that a preestablished limitation is any practice that limits the specific medical services in subdivision 2 in **any** way—including by restricting who may be reimbursed for providing them. Therefore, the Court finds that

the billing limitations entered into by Farmers violate the No-Fault Act as prohibited preestablished limitations on medical expense benefits.

### 3. Effect of Managed Care Services

The Court also concludes that the billing limitations violate the No-Fault Act under another clause as having the effect of managed care services.  Section 65B.44, subdivision 1(c) states:

> No reparation obligor or health plan company . . . may enter into or renew any contract that provides, **or has the effect of providing**, managed care services to no-fault claimants.  For the purposes of this section, 'managed care services' is defined as any program of medical services that uses health care providers managed, owned, employed by, or under contract with a health plan company.

Minn. Stat. § 65B.44, subd. 1(c) (emphasis added).

There is no dispute that Farmers is an obligor or health plan company under the Act.  There is also no dispute that subdivision 1(c) plainly prohibits Farmers from enacting a managed care services program.  The question is whether the billing limitations have the "effect of providing" managed care services.

The parties dispute both what the primary qualities of a managed care service are and whether the billing limitations lead to similar effects.  Specifically, Farmers argues that this prohibition does not apply because it is undisputed that it has not entered into any contracts **to provide** services.  Instead, the billing limitations amount to the opposite: to **not** provide services.  Additionally, Farmers emphasizes that the vast majority of providers were never impacted by billing limitations, and that distinguishes their

limitations from traditional managed care services.  But how many providers were or are covered is immaterial.  The question before the Court is whether Farmers is free to institute billing limitations on any number of providers, for any reason.

The phrase "the effect of" is broad but purposefully chosen by the legislature. Plainly, the legislature sought to ensure both that managed care services were not utilized and that insurance companies did not achieve the same effect by other less obvious ways. Here, the Court concludes that Farmers is in effect creating managed care services. Rather than contract with a set of providers to provide services, it has opted to contract with providers to not.  The effect is the same: insureds may only receive services from a subset of providers that Farmers has decided to favor over others.  In essence, Farmers has reverse-engineered managed care services.

Thus, the Court concludes that the billing limitations entered into by Farmers violate the No-Fault Act both as prohibited preestablished limitations in violation of §65B.44 subsection 2a and having the same effect as managed care services in violation of subdivision 1(c).[6]

---

[6] As an aside, Farmers also argues that prohibiting billing limitations is against public policy because the agreements were designed to protect against fraud and because public policy favors the freedom to contract.  But the No-Fault Act already provides extensive insurance fraud protections, and the Minnesota Supreme Court has rejected freedom of contract arguments to circumvent the No-Fault Act.  *See* Minn. Stat. § 65B.44, subd. 2a(a); *Hertz Corp. v. State Farm Mut. Ins.*, 573 N.W.2d 686, 689–90 (Minn. 1998).  Both public policy arguments are unavailing.

## II.     MINNESOTA'S CONSUMER FRAUD ACT

Having determined that the billing limitations violate the No-Fault Act, the Court now turns to the causes of action in this case, beginning with the Damages Class's Minnesota Consumer Fraud Act ("MCFA") claims.  The MCFA prohibits:

> [t]he act, use, or employment by any person of any fraud, false pretense, false promise, misrepresentation, misleading statement or deceptive practice, with the intent that others rely thereon in connection with the sale of any merchandise, whether or not any person has in fact been misled, deceived, or damaged thereby, is enjoinable . . . .

Minn. Stat. § 325F.69, subd. 1.

The MCFA itself provides that fraudulent practices are enjoinable, but Plaintiffs may bring a claim for damages under the Private Attorney General statute, which in turn requires that a plaintiff "prove a causal relationship between the alleged injury and the wrongful conduct that violates the statute."  *Graphic Commc'ns Loc. 1B Health & Welfare Fund A v. CVS Caremark Corp*, 850 N.W.2d 682, 693 (Minn. 2014).  Additionally, a private action to enforce the MCFA is only available if it will benefit the public.  *Ly v. Nystrom*, 615 N.W.2d 302, 314 (Minn. 2000).  Thus, to succeed in their MCFA claim, Plaintiffs must prove that (1) failing to disclose the billing limitations amounted to a fraud or misrepresentation, (2) that Farmers purposefully kept that information from Plaintiffs, (3) that they were injured due to that omission, and (4) that enforcing their claim benefits the public.

### A. Omissions As Fraud or Misrepresentation

Omission-based consumer fraud claims face additional hurdles. In order for an omission to be actionable under the MCFA, the concealment or omission must be of a material fact in connection with the sale that a defendant had a duty to disclose. *Graphic Commc'ns*, 850 N.W.2d at 695. This is an omissions case because it is undisputed that Farmers did not disclose the billing limitations to insureds or the State of Minnesota.

#### 1. Materiality

Farmers argues that even if the No-Fault Act was violated, whether the billing limitations are material terms to any individual Class Member is a question of fact for the jury. Farmers is correct that materiality is typically a question of fact for the jury. *See STAR Ctrs., Inc. v. Faegre & Benson, L.L.P.*, 644 N.W.2d 72, 77 (Minn. 2002). But materiality becomes a question of law "when reasonable minds can reach only one conclusion." *Id.* (citation omitted).

Here, the Court concludes that the billing limitations are material as a matter of law because they violate the No-Fault Act. Although Farmers points to evidence that individual consumers may not have cared about the billing limitations and that some of the named Plaintiffs opted to repurchase the policies knowing of the billing limitations, neither is the proper inquiry. Ultimately, the Court finds that no consumer could have purchased these exact policies had the billing limitations been known to the Department of Commerce because they violate the No-Fault Act. That necessarily makes the billing limitations material. *See Material*, Black's Law Dictionary (11th ed. 2019) (defining

"material" as "[o]f such a nature that knowledge of the item would affect a person's decision-making").

### 2. Duty to Disclose

Farmers argues that it was under no obligation to disclose the billing limitations to Plaintiffs.  A duty to disclose may be imposed by statute or by common law.  *Graphic Commc'ns*, 850 N.W.2d at 697.  Plaintiffs advance three separate theories under which Farmers may have had a duty to disclose, and the Court will discuss each accordingly.

*Duty to Disclose Imposed by Statute*

Plaintiffs claim that the No-Fault Act requires disclosure of the billing imitation agreements because insurers must inform insureds that the policies comply with the Act and certify the same to the State.  *See* Minn. Stat. § 65B.49, subd. 1 (requiring that policies "contain an agreement or endorsement that insurance is provided [ ] in accordance with and subject to the provisions [of the Act]"); *see also* § 65B.50 (requiring insurers to "file with the commissioner . . . a written certification that it will afford at least the minimum security provided [by the Act] to all policyholders").

However, for a statute to create an affirmative duty to disclose, it must do so explicitly.  *See Graphic Commc'ns*, 850 N.W.2d at 689.  Farmers' position is that it did not know that the billing limitations violated the No-Fault Act.  Under Plaintiffs' reading of the statute, insurers must disclose any information that could possibly be interpreted as a violation of the No-Fault Act.  Of course, certifying that its policies meet the requirement of the Act when in fact they do not would itself be a violation of § 65B.50 of the Act.  But

that is not the same as creating an explicit duty to disclose certain information to all insureds. Because the No-Fault Act does not explicitly impose a duty to disclose, Plaintiffs' first theory fails.

*Heightened Duties for Insurance Companies*

Plaintiffs also argue that Farmers had a heightened duty to disclose as an insurer under *Canadian Universal Ins. v. Fire Watch, Inc.*, 258 N.W.2d 570, 575 (Minn. 1977). In *Canadian Universal*, the Minnesota Supreme held that

> when an insurer by renewal of a policy or by an endorsement to an existing policy substantially reduces the prior insurance coverage provided the insured, the insurer has an affirmative duty to notify the insured in writing of the change in coverage. Failure to do so shall render the purported reduction in coverage void. Any question of an individual's insurance coverage shall then be determined in accordance with the terms of the original policy prior to the renewal or endorsement.

*Id.*

Plaintiffs argue that when Farmers entered into the billing limitations, it was limiting or reducing coverage, which triggered a duty to disclose under *Canadian Universal*. However, one of the disputed issues in this litigation is whether the billing limitations "substantially" reduced coverage. Although the Court has concluded that Farmers violated the No-Fault Act, it does not necessarily follow that any individual's coverage was "substantially" reduced. Furthermore, rather than create a heightened duty to disclose, *Canadian Universal* created a requirement to disclose the change in coverage in order for the change to be effective. *Id.* ("[W]e conclude that since Canadian

did not provide a written explanation notifying Fire Watch that the endorsement substantially reduced its insurance coverage, the endorsement is void."). Therefore, the Court concludes that Farmers did not have a heightened duty to disclose under *Canadian Universal*, and even if it did, it would only void the change in coverage.

Duty to Disclose Due to Special Circumstances

Finally, the Minnesota Supreme Court has explained that "an omission-based consumer fraud claim is actionable under the [M]CFA when special circumstances exist that trigger a legal or equitable duty to disclose the omitted facts." *Graphics Commc'ns*, 850 N.W.2d at 695. In *Klein v. Edina Nat'l Bank,* 293 Minn. 418, 421 (Minn. 1972), the Minnesota Supreme Court provided three examples of such special circumstances: (1) where a person has a confidential or fiduciary relationship with the other party; (2) where one has special knowledge of material facts to which the other party does not have access; and (3) where a person who speaks must say enough to prevent the words communicated from misleading the other party. *See also Graphic Commc'ns*, 850 N.W.2d at 695. These examples are not intended to be exclusive. *Id.* (citing *Boubelik v. Liberty State Bank*, 553 N.W.2d 393, 398 (Minn. 1996)).

Plaintiffs primarily argue that this case fits the second example because Farmers had special knowledge of material facts that no one else had access to.[7] Farmers argues

---

[7] Plaintiffs also briefly argue that the third example applies, requiring a party to say enough to prevent words communicated from being misleading. But there is nothing on the

that exclusive knowledge is not sufficient and that the party must have knowledge of actual fraud.  *See Richfield Bank & Trust Co. v. Sjogren,* 309 Minn. 362, 367–69 (1976) (concluding that a bank that had actual knowledge that one of its depositors was irretrievably insolvent, and thus engaging in fraud by entering into a contract with the plaintiff, had a duty to disclose the depositor's insolvency to the plaintiff).

Farmers argues that the second example does not apply because Farmers had no actual knowledge of fraudulent conduct, which the Minnesota Supreme Court suggested is necessary for the second example to apply in *Graphic Communications*.  *See Graphic Commc'ns*, 850 N.W.2d at 698 (rejecting plaintiff's theory of special knowledge and noting that *Richfield* is the only case to ever apply the example about special knowledge of a material fact).  However, the Minnesota Supreme Court has explicitly stated that "if [defendant] has special knowledge of material facts to which the other party does not have access, it has a duty to disclose."  *Boubelik,* 553 N.W.2d at 399.  Though some courts have assumed that actual knowledge of fraud is necessary, that has not been explicitly established by the Minnesota Supreme Court as a requirement.  But *see, e.g., Song v. Champion Petfoods USA, Inc.*, No. 18-3205, 2020 WL 7624861, at *11 (D. Minn. Dec. 22, 2020), *aff'd* 27 F.4th 1339, 1346 (8th Cir. 2022); *Grady v. Progressive Direct Insurance Co.,* 2022 WL 18494898, at *4 (D. Minn. Nov. 30, 2022).

---

record to suggest that Farmers communicated with Plaintiffs regarding eligible providers and therefore the Court concludes this case is not well-suited for the third *Klein* category.

After reviewing the relevant cases from the Minnesota Supreme Court, the Court concludes that this case constitutes special circumstances under *Graphic Communications* and *Klein*. The Court reiterates that the examples in *Klein* were not meant to be exclusive. The fact that Farmers actively limited disclosure of the billing limitations, that prospective and actual insureds had no way to discover them until after they had bought the policies and sought coverage, and that Farmers never disclosed the limitations to the DOC all support that Farmers had special knowledge of material facts to which the other party did not, giving rise to a duty to disclose. Therefore, the Court concludes that the omission of the billing limitations is actionable under the MCFA.

### B.   Causal Nexus

Although the Minnesota legislature has relaxed the traditional common law reliance standard for MCFA claims, causation remains an element that must be proved. *Grp. Health Plan, Inc. v. Philip Morris Inc.*, 621 N.W.2d 2, 13–14 (Minn. 2001). However, Plaintiffs must prove only a causal nexus between the prohibited conduct and the damages. *State v. Minn. Sch. of Bus., Inc.*, 935 N.W.2d 124, 134, 136 (Minn. 2019). The Minnesota Supreme Court explained that "an element of individual reliance is embedded in the causal nexus requirement because a fraudulent or misleading statement cannot by its nature cause harm unless the statement 'had some impact on' inducing the individual plaintiff's actions." *Id.* (quoting *Grp. Health*, 621 N.W.2d at 14). Proof "need not include direct evidence of reliance by individual consumers of defendants' products," and "the causal nexus and its reliance component may be established by other direct or

-40-

circumstantial evidence that the district court determines is relevant and probative as to the relationship between the claimed damages and the alleged prohibited conduct." *Grp. Health Plan, Inc.*, 621 N.E.2d at 14.  This relaxed showing is especially relevant in cases where the defendant engaged in "a lengthy course of prohibited conduct that affected a large number of consumers." *Id.*  A defendant's intent to influence consumers can be important and relevant evidence.  *Minn. Sch. of Bus., Inc.*, 935 N.W.2d at 136.

Plaintiffs argue they have established reliance as a matter of law because (1) the legislature intended for consumers to rely on the No-Fault Act; (2) consumers relied on Farmers' statements that it was in compliance with the Act; (3) had Farmers disclosed the limitations, the policies would not have been approved by the DOC; and (4) consumers expect auto insurance policies to conform to a basic level of quality.  Farmers counters that whether the record establishes a causal nexus is typically a fact question for the jury.

The Court finds that there are genuine factual disputes regarding the requisite nexus between any damages and the billing limitations, which must be submitted to the jury.  Although the Court has found that the billing limitations are material, that does not mean that consumers relied on those statements and thus they caused any injuries.  The parties offer competing expert testimony contesting whether billing limitations actually matter to consumers and whether Plaintiffs—individually or as a class—were harmed by them.  Additionally, although the Court did not exclude the expert testimony of Allan

Schwartz, who Plaintiffs primarily rely on to establish class wide damages, a jury may yet decide that there are no damages in this case.

However, contrary to Farmers' suggestions, whether a causal nexus exists need not turn on individualized considerations and the jury may consider all of the facts and circumstances of the alleged fraud, including whether the fraud was longstanding, pervasive, and widespread, whether Farmers intended and understood that consumers would rely on the omission, and whether Farmers omitted information that consumers would typically expect to know. *Minn. Sch. of Bus., Inc.*, 935 N.W.2d at 136. Thus, reliance is not necessarily an individualized inquiry ill-suited for class actions like this case.

### C.    Public Benefit

Whether an action is in the public benefit depends on multiple factors, including "the degree to which the defendants' alleged misrepresentations affected the public; the form of the alleged representation; the kind of relief sought; and whether the alleged misrepresentations are ongoing." *Khoday v. Symantec Corp.*, 858 F. Supp. 2d 1004, 1017 (D. Minn. 2012).

The Court concludes that whether the public benefits from the challenge to Farmers' practices is a question of fact best left to the jury. There are certain considerations like the size of the class, the purpose of the billing limitations, the risk of fraud, and whether the billing limitations were designed to lower Farmers' costs. Ultimately, a jury is well-suited to weigh these considerations and determine whether this requirement is satisfied.

### D.    Damages

Finally, Farmers argues Plaintiffs cannot establish damages as a matter of law because (1) refunding the entire premiums paid is not a permissible remedy, (2) the MCFA does not allow restitution or disgorgement, (3) the Court may not award the requested damages because of the "filed rate doctrine."  Alternatively, Farmers argues that there is no evidence that any Class member has been harmed because Farmers never denied reimbursement for treatment obtained.  The Court will address each of Farmers' objections accordingly.

### 1.  Full Refunds

First, to the extent that Plaintiffs seek full refunds for premiums as a remedy, full refunds are not appropriate because the insurance policies had at least some value.  Any theory of damages that seeks to refund all premiums paid would run afoul of the predominance requirement for class certification under Federal Rule of Civil Procedure 23(b)(3) because the Court would need to consider the value that each individual Class Member received.  *See, e.g., Buetlow v. A.L.S. Enterprises, Inc.*, 259 F.R.D. 187, 192 (D. Minn. 2009) (denying a class certification in part because comparing the price paid by each class member and the value they received requires an individualized inquiry that "weighs strongly against class certification").  Therefore, the Court will grant summary judgment to Farmers on this specific issue and Plaintiffs may not seek damages under a full-refund theory.

### 2. Restitution and Disgorgement

Second, Farmers argues that Schwartz's model is not allowed under Minnesota law because a private plaintiff may not recover restitution or disgorgement under the MCFA. Farmers relies on the fact that the MCFA does not explicitly allow for restitution or disgorgement, unlike other Minnesota statutes. But Farmers misconstrues the canons of interpretation as applied by Minnesota courts. The comparison is not between statutes, but between different sections of the same statute. *Gen. Mills, Inc. v. Comm'r of Revenue,* 931 N.W.2d 791, 800 (Minn. 2019) ("When the Legislature uses limiting or modifying language in one part of a statute, but omits it in another, we regard that omission as intentional and will not add those same words of limitation or modification to parts of the statute where they were not used.").

Farmers also argues that although the Attorney General may seek restitution for violations of the MCFA, that is only because of the Attorney General's *parens patriae* authority. Farmers bases this argument on *Minnesota School of Business, Inc.,* 935 N.W.2d at 138–39, and on *Curtis v. Altria Group. Inc.*, 813 N.W.2d 891, 899 (Minn. 2012). But neither case supports Farmers' proposition.

In *Minnesota School of Business, Inc.*, the Minnesota Supreme Court noted that "[t]he Attorney General has the authority to bring a suit . . . to seek restitution for violations of the MCFA." 935 N.W.2d at 139. The "Private AG Statute" states that

> any person injured by a violation of any of the laws referred
> to in subdivision 1 may bring a civil action and recover
> damages, together with costs and disbursements, including

> costs of investigation and reasonable attorney's fees, and receive **other equitable relief as determined by the court. . .** In any action brought by the attorney general pursuant to this section, the court may award **any of the remedies allowable under this subdivision.**

Minn. Stat. § 8.31, subd. 3a (emphasis added).  By its clear and unambiguous language, the statute provides that "other equitable relief as determined by the court" is available to private litigants, and that the attorney general may obtain the same relief.  Thus, it is the other way around—the Attorney General may seek restitution and disgorgement because private litigants may.

Additionally, in *Curtis,* the Minnesota Supreme Court stated that "remedies available to the State AG are broader than those available to a private litigant."  *Curtis*, 813 N.W.2d at 899.  But Farmers takes that language out of context.  The Minnesota Supreme Court was not discussing remedies generally, but rather noting that Minnesota's Attorney General has access to the remedies under the statute "**but also** the broad remedies solely available to the State, including civil penalties."  *Id.* (emphasis added).  Therefore, Farmers' argument that Plaintiffs may not seek restitution or disgorgement is without support and the Court concludes that "other equitable relief" may include restitution and disgorgement.

### 3.  The Filed Rate Doctrine

Farmers argues that Plaintiffs' damages theories also fail because they would violate the filed rate doctrine as described in *Schermer v. State Farm Fire & Casualty Co.,* 721 N.W.2d 307 (Minn. 2006).  The filed rate doctrine is a concept that developed in the

fields of public utility and energy law.  It "forbids a regulated entity [from charging] rates for its services other than those properly filed with the appropriate federal regulatory authority."  *Ark. La. Gas Co. v. Hall*, 453 U.S. 571, 577 (1981).  It also prohibits a party from recovering damages that are "measured by comparing the filed rate and the rate that might have been approved absent the conduct at issue."  *H.J. Inc. v. Nw. Bell Tel. Co.*, 954 F.2d 485, 488 (8th Cir. 1992).  The purpose of the filed rate doctrine is to: "(1) preserve the regulating agency's authority to determine the reasonableness of rates; and (2) [e]nsure that the regulated entities charge only those rates that the agency has approved or been made aware of as the law may require."  *Id.*

The Minnesota Supreme Court applied the filed rate doctrine to the insurance industry in *Schermer*.  721 N.W.2d at 314.  *Schermer* involved a challenge to State Farm's Utilities Rating Plan, which applied surcharges to homeowners' insurance premiums based on the age of the home's electrical system, which the plaintiffs argued was racially discriminatory.  *Id.* at 309–10.  The court acknowledged that the insurance industry, like the public utility industry, is a business that is "affected with a public interest."  *Id.* ("Although [filed rate doctrine] precedent has arisen primarily in the context of electric, gas, and telephone utilities, the principle applies equally to rates of insurers because insurance is similarly regarded as a business that is affected with a public interest.") (internal quotations omitted).  The Minnesota Supreme Court expressly concluded that

-46-

the filed rate doctrine should apply to insurance rates that are filed with and approved by the DOC. *Id.* at 317.

At this point, the parties disagree on two issues: (1) whether the filed rate doctrine is an affirmative defense that must be raised at the pleading stage or be forfeited, and (2) whether Plaintiffs' damages theories are barred by the doctrine. However, the Court need not reach whether the filed rate doctrine is an affirmative defense because it concludes that even if it were properly before the Court, Plaintiffs' damages theories are not barred by it.

Farmers challenges Plaintiffs' damages theory because Schwartz measures damages by calculating how much less value Plaintiffs received for their policies, and then dividing that loss in value to Class Members proportionally to the premiums they paid to Farmers. Of course, the premiums paid by Plaintiffs were filed with and approved by the Department of Commerce. Plaintiffs argue that the filed rate doctrine does not apply because they are neither challenging the reasonableness of rates nor requesting a refund directly or indirectly. But the Minnesota Supreme Court has rejected similar damages theories. *See Hoffman v. N. States Power Co.*, 764 N.W.2d 34, 47 (Minn. 2009) (rejecting a damages theory where "damages are measured as the difference between what the appellants actually paid for the performance of the service not received and the presumably lesser amount they would have paid had the services not been required in the tariff."). Additionally, insureds will not receive damages unless they join this class

action.  Thus, unless every single insured joins, there are some insureds who will not receive any damages at all.  This fact weighs in favor of applying the filed rate doctrine because one of its central tenets is that awarding money damages in a case where plaintiffs claim they received less in services than they were supposed to "would result in [class members] paying less for the [services] than non-class members."  *Id.* at 48.

Nevertheless, the Court concludes that Plaintiffs' damages theories, including Schwartz's damages model, are not barred by the filed rate doctrine because Farmers did not disclose the billing limitations to the DOC, and the services provided—or in this case **not** provided—were not actually reviewed by the DOC.

The very foundation of the filed rate doctrine is that another branch of government has been empowered by the legislature with approving the services and rates charged. *See Schermer*, 721 N.W.3d at 311–12.  Where a central component of a claim is not only that a material aspect of the services was not disclosed for review or consideration, or generally known to the relevant agency, **but also** that the policy itself may have been contrary to law, then the concerns of separation of power and comity identified in *Schermer* are not present.  *See id.* at 314 ("We also conclude that the filed rate doctrine should reflect separation of powers and comity considerations.").  Thus, courts have generally declined to apply the filed rate doctrine where plaintiffs challenge a defendants' fraudulent omission.  *See, e.g., Schwartz v. State Farm Mut. Auto Ins.*, No. 1:18-00328, 2018 WL 4148434, at *10 (D.N.M. Aug. 30, 2018) (declining to apply the filed rate doctrine

where plaintiff challenged a misrepresentation and not the rate); *Skochin v. Genworth Life, Ins. Co.*, 413 F. Supp. 3d 473, 483–84 (E.D. Va. 2019) (declining to apply the filed rate doctrine in a case involving fraud by an insurance company); *Trzeciak v. Allstate Property & Cas. Ins.*, 569 F. Supp. 3d 640, 649–50 (E.D. Mich. 2021) (same).  Likewise, the Court will decline to apply the filed rate doctrine here.

To summarize, the Court finds that the MCFA claim is actionable but that the evidence presented precludes summary judgment on behalf of the Damages Class.  The jury must determine whether Plaintiffs suffered any damages in connection to the billing limitations and whether Plaintiffs' claims are in the public benefit.  The Court likewise concludes that Plaintiffs' damages theory is viable with the exception of seeking a full refund of the premiums paid.

## III.   INJUNCTIVE CLASS CLAIMS

Along with the same claims under the MCFA, the Injunctive Class seeks a preliminary injunction enjoining Farmers from enforcing any billing limitations with respect to benefits provided to members of the Injunctive Class and a declaratory judgment stating that Farmers must pay benefits in accordance with the No-Fault Act and their contractual promises.

### A.  Minnesota Deceptive Trade Practices Act

Plaintiffs allege that Farmers' omissions violated the MDTPA for the same reasons they violated the MCFA.  Specifically, Plaintiffs claim that Farmers' use of billing limitations constituted a deceptive trade practice because Farmers represented that a

service had "characteristics, . . . uses, benefits, [and] quantities" that they did not have; represented that its no-fault coverage was of a "particular standard, quality or grade" when it was of another; and Farmers "engage[d] in conduct which . . . creates a likelihood of confusion or misunderstanding" regarding the extent of the coverage. Minn. Stat. §§ 325D.44, subd. 1(5), (7), (13). The sole remedy for an MDTPA violation is injunctive relief. *Dennis Simmons, D.D.S., P.A. v. Modern Aero, Inc.*, 603 N.W.2d 336, 339 (Minn. Ct. App. 1999) (citation omitted). Additionally, Plaintiffs must not only prove that Farmers' misrepresentations created a likelihood of confusion but also that they are likely to suffer future harm due to the allegedly deceptive practices. *Gardner v. First Am. Title Ins. Co.*, 296 F. Supp. 2d 1011, 1020 (D. Minn. 2003) ("Plaintiffs must advance **record evidence** sufficient to support an inference of future harm to Plaintiffs."). The MCFA and MDTPA are broadly construed in favor of protecting consumers. *Stale by Humphrey v. Philip Morris, Inc.*, 551 N.W.2d 490, 496 (Minn. 1996).

Farmers argues that the injunctive class cannot show a likelihood of future harm for failure to disclose the billing limitations. Farmers plans to introduce evidence that only two billing limitation agreements remain in effect. They also intend to argue that Plaintiffs cannot show a real and immediate threat of being induced to buy Farmers insurance without knowledge of billing limitations, being involved in an accident, and seeking no-fault benefits from providers subject to billing limitation.

Farmers proposes an overly restrictive view of likelihood of future harm.  Plaintiffs need not prove that they will purchase another policy from Farmers to establish a likelihood of future harm.  *Cf. Knotts v. Nissan N. Am., Inc.*, 346 F. Supp. 3d 1310, 1328 (D. Minn. 2018) (declining to dismiss MDTPA claim on the basis of failure to plead injunctive relief when the plaintiff made multiple allegations of future harm, none of which were that the plaintiff would buy another car from the defendant manufacturer).  In fact, Plaintiffs' theory is that Injunctive Class members are already being continuously harmed by the billing limitation because that they are receiving less value than they should for their insurance premiums and have no guarantee that Farmers is not planning to enter into future confidential billing limitations.

Because the Court has concluded that the billing limitations violate the No-Fault Act, the Court also finds that continuing to enforce the billing limitations constitutes a violation of the MDTPA because Farmers can no longer certify that its policies comply with the No-Fault Act.  As such, Plaintiffs' theory that they are continuously harmed as long as the billing limitation agreements are in place is correct and the threat of future harm element is met.  Therefore, the Court will grant summary judgment to the Injunctive Class and enjoin Farmers from enforcing any current or future billing limitations in violation of the No-Fault Act.

### B.    Breach of Contract

Plaintiffs seek a declaratory judgment based on their breach of contract claim. Plaintiffs argue that by entering into billing limitation agreements, Farmers has

repudiated its contractual obligations under the policies.   But Plaintiffs have failed to identify any term in their policies that expressly guarantees them their choice of provider and instead rely on Farmers' certification that the policies comply with the No-Fault Act.

The Court will not declare that the contract between the parties incorporates every requirement of the No-Fault Act such that if the law is violated, then the contract has been breached.  *See Palmer v. Illinois Farmers Ins. Co.*, 666 F.3d 1081, 1086 (8th Cir. 2012) (rejecting similar contract claims); *see also Nelson v. Am. Fam. Mut. Ins. Co*., 899 F.3d 475, 480 (8th Cir. 2018) ("We decline to incorporate a statutory duty into the Policy where the contractual provisions about replacement cost are unambiguous and where the relevant insurance statutes do not create a private right of action.").  Thus, the Court will grant summary judgment to Farmers on the breach of contract claims.

## IV.    FGI AND FICI

Finally, Farmers has requested that the Court dismiss all claims against FGI and FICI because FGI is not an insurer and FICI has not issued any auto insurance policies in Minnesota during the class period.  Plaintiffs allege that each of the entities were involved in the fraudulent conduct because FGI wrote all of the Class members' policies and because FICI is a party to one billing limitation.

The Court finds that genuine material disputes remain as to the involvement of FGI that preclude summary judgment.   As Farmers admits, FGI provided administrative services for the other Defendants.  (Giles Decl. ¶ 3.)  Although there is no dispute that FGI did not issue any policies, Plaintiffs allege that FGI may be partially responsible for the

material omissions as drafters of the policies and because they marketed the policies. (2nd Decl. Kristen G. Marttila ("2nd Marttila Decl."), Ex. 5 ("Giles Dep."), at 121:6–17; 135:8–137:14, Mar. 9, 2023, Docket No. 620-4.)  Therefore, the Court will deny the request to dismiss FGI from this case.

However, the Court will grant summary judgment as to FICI because there is no genuine dispute that FICI did not issue any auto insurance policies in Minnesota during the class period.  Although Plaintiffs argue that FICI participated in the alleged fraud, they do not point to sufficient facts.  Plaintiffs only bring to the Court's attention one of the billing limitation agreements, arguing that FICI was a party to it. (*See* 1st Marttila Decl., Ex. 18, Feb. 16, 2023, Docket No. 550-15.)  Upon careful review of the agreement, the Court finds that it does not specifically mention FICI.  And even if the Court found that FICI was a party to one of the billing limitation agreements, the question is whether FICI's behavior caused Plaintiffs' injuries, and Plaintiffs do not dispute that FICI did not issue policies to any Class Members.  Therefore, the Court will dismiss FICI from this case.

## CONCLUSION

The Court denies each of the motions to exclude expert testimony because they do not adequately challenge the methodology or reliability of each witness.  The Court concludes that Plaintiffs' MCFA claims are actionable but that issues of fact remain as to the causal nexus to any damages precluding summary judgment.  The Court grants summary judgment to the Injunctive Class on its MDTPA claim and enjoins Farmers from

enforcing the billing limitations or entering into similar agreements in the future. The Court also grants summary judgment to Farmers on the breach of contract claim.  Finally, the Court denies Farmers' request to dismiss the claims against FGI but grants summary judgment in favor of FICI on all claims and dismiss FICI from this case.

## ORDER

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that:

1. Defendants' Motion to Exclude Expert Testimony of Akshay Rao [Docket No. 552] is **DENIED**;

2. Defendants' Motion to Exclude Expert Testimony of Michael J. Rothman [Docket No. 554] is **DENIED**;

3. Defendants' Motion to Exclude Expert Testimony of Allan I. Schwartz [Docket No. 555] is **DENIED;**

4. Plaintiffs' Motion to Exclude Expert Testimony of Nancy Watkins [Docket No. 558] is **DENIED,** but plaintiffs' request to strike the two challenged errata sheet changes [Docket No. 564-11] by Watkins is **GRANTED**;

5. Plaintiffs' Motion to Exclude Expert Testimony of Bruce Strombom [Docket No. 573] is **DENIED;**

6. The Damages Class's Re-Filed Motion for Partial Summary Judgment and the Injunctive Class's Re-Filed Motion for Summary Judgment [Docket No. 546] is **GRANTED in part and DENIED in part** as follows:

-54-

   a. The Court finds that billing limitation agreements entered into by Farmers violate Minnesota's No-Fault Automobile Insurance Act;

   b. The Court finds that the Damages Class's MCFA claim is actionable, but issues of fact remain as to causal nexus and damages;

   c. Defendants are enjoined from enforcing or entering into billing limitation agreements as alleged in this action.

7. Defendants' Motion for Summary Judgment [Docket No. 557] is **GRANTED in part and DENIED in part** as follows:

   a. Summary judgment is granted as to Defendant FICI and FICI is **DISMISSED** from this case;

   b. Summary judgment is **GRANTED** to Defendants on Plaintiffs' breach of contract claim;

   c. Summary judgment is **DENIED** as to all other Defendants on the MCFA and MDTPA claims.

8. The case will be placed on the Court's next trial calendar.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

DATED:  September 13, 2023
at Minneapolis, Minnesota.

                                      JOHN R. TUNHEIM
                                United States District Judge